**Wilbert J. SHEETS**

v.

**YAMAHA MOTORS CORPORATION, U.S.A.**

**Civ. A. No. 82–4402.**

United States District Court, E.D. Louisiana.

March 31, 1987.

Russ M. Herman and Steven J. Dane, Herman, Herman & Katz, New Orleans, for plaintiff.

Donald Ensenat and David F. Bienvenu, Camp, Carmouche, Palmer, Barsh & Hunter, New Orleans, for defendant.

## OPINION

CHARLES SCHWARTZ, Jr., District Judge.

This matter came before the Court for non-jury trial in two stages, the first heard August 25–26, 1986 and recessed for further briefing and discovery, and the second heard December 29, 1986. Having considered the evidence, the parties' numerous memoranda and the applicable law, the Court rules as follows. To the extent any of the following findings of fact constitute conclusions of law, they shall be adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they shall be so adopted.

### Procedural Background

Plaintiff filed this suit on October 5, 1982 against Yamaha Motor Corp. U.S.A. ["Yamaha U.S."], alleging defendant misappropriated an air snorkel device allegedly invented by plaintiff.[1] On April 6, 1984, plaintiff joined Yamaha U.S.' Japanese parent, Yamaha Motor Company ["Yamaha Japan"], which unbeknownst to plaintiff obtained a patent for the device during the pendency of this litigation.

Initially, the Court heard evidence pertinent to plaintiff's state law claims for misappropriation of trade secret under Louisiana statutory law and unjust enrichment under general civil law, following which the Court took under submission defendants' motion for involuntary dismissal of those claims. However, as will be explained more fully below, the evidence raised serious questions regarding defendants' conduct during pretrial discovery, and the Court recessed the trial, ordering production of certain documents by defendants. The Court also ordered further briefing of plaintiff's claims and on the question whether sanctions should be assessed against the defendants under Rules 11, 26(g) and 37 of the Federal Rules of Civil Procedure. Following submission of the materials in question, the Court reconvened trial to receive evidence pertinent to plaintiff's claims that defendants' patent over the air snorkel device was invalid and for

---

1. On November 9, 1982, plaintiff amended his complaint to add as defendant Yamaha International Corp., another California corporation. It was subsequently determined Yamaha International tional was not involved in this dispute, and Yamaha International was dismissed on unopposed motion.

attorney's fees and costs incurred due to defendants' improper conduct during pretrial discovery.

As will be discussed more fully below, defendants' motion for involuntary dismissal is hereby granted, and plaintiff's state law claims for misappropriation of trade secret and for unjust enrichment are hereby dismissed with prejudice. The Court does not reach the question of the validity of the patent, in view of the foregoing conclusions and certain stipulations reached by the parties. The Court also finds appropriate imposition of sanctions against the defendants.

### Findings of Fact

Plaintiff is a Louisiana resident. Defendant Yamaha Japan, is a Japanese corporation with its principal place of business in Itawa, Japan; it manufactures Yamaha motor products. Defendant Yamaha U.S. is its American distributor, incorporated and having its principal place of business in California.

Sometime prior to March 18, 1976, plaintiff's sons Wayne and Thomas Sheets established a motorcycle sales proprietorship in Gonzales, Lousiana, named Cycle Country U.S.A., which they operated with advice and assistance from their father. Plaintiff had no ownership interest in the proprietorship, but rather acted as trouble shooter for his sons, working around the shop as more of a hobby than anything else. All three were also interested in recreational tri-motorcycle racing, in which plaintiff's sons competed, and the Court finds plaintiff and his sons worked on tri-motorcycles as an adjunct to their interest in racing, all of which activities were in the nature of a hobby.

On or about March 18, 1976, Cycle Country became an authorized dealer for Yamaha products. Among the Yamaha vehicles sold by Cycle Country were Yamaha tri-motorcycles ["tri-motos"], which plaintiff's sons also used for racing. Shortly after Cycle Country received its first shipment of Yamaha tri-motos, series 125, plaintiff and his sons became aware through customer complaints and their own experiences that the tri-motos were stalling out or "drowning" in water and on mud and other rough terrain, due to a defect in the air intake system, even though the vehicles were supposed to be operable under such conditions.

The specific nature of the defect was the placement of the air intake at the back of the machine between the two rear wheels, so that water and dust or other foreign matter would splatter up and be drawn into the carburetor, causing the vehicle to stall. To resolve this problem, plaintiff closed off the rear air intake and devised an air snorkel to bring in air through the front of the vehicle at a higher level, under the seat cover, and then filter the air. Following additional relatively minor refinements to the device, this adjustment effectively resolved the stalling problems experienced by plaintiff's sons and Cycle Country customers, and the device was installed in Cycle Country's demonstrator model and other tri-motos used recreationally by some of plaintiff's relatives and friends.[2]

Based upon the trial testimony of plaintiff's sons and two purchasers of tri-motos containing the plaintiff's device, Eugene Barber and Glen Moran, the Court finds plaintiff himself took no precautions calculated to preserve the secrecy of the device, to reserve to himself any economic or other benefit from his device or to prevent its use by others. Rather, the Court finds only limited secrecy was maintained with respect to the device, kept by tacit agreement among plaintiff's sons and their friends to protect a perceived racing advantage.

Plaintiff's son Thomas Sheets further testified and plaintiff himself confirmed the device in question was shown at a Yamaha dealers' sales seminar meeting in August 1980 and discussed there as a resolution to shifting and drowning problems.[3] Al-

---

2. On cross examination, plaintiff named nine individuals owning modified tri-motos.

3. As will be discussed further below, defendants' failure to produce even this favorable evidence of events transpiring at the sales seminar emphasizes how defendants acted contumaciously

though the tri-moto was brought to the meeting at the request of Bob Aron, a Yamaha U.S. district sales manager, the Court finds no coercion implicit in the request and finds circumstances surrounding the disclosure further illustrate the absence of any measures taken by the plaintiff to prevent or limit disclosure of his device and/or preserve its secrecy. Nor does the Court accept plaintiff's implications that he was somehow tricked into making this disclosure; plaintiff freely turned his modification over to Cycle Country, without restriction, and the disclosure was made on behalf of Cycle Country, in which plaintiff had no ownership interest.

Notwithstanding these findings as to the plaintiff's failure to maintain the device as a secret, the Court finds defendants used plaintiff's idea. Based upon the uncontroverted trial testimony of plaintiff and plaintiff's sons,[4] the Court finds Yamaha representatives became aware of plaintiff's proven successful device when they visited Cycle Country on or about spring 1980, and observed the device installed in a tri-moto display model. Upon seeing a Yamaha advertisement in the November 1981 "Outdoor Life" magazine, Exhibit 6, plaintiff became aware Yamaha was selling tri-motos with an air snorkel device like the plaintiff's.

Defendants assert Yamaha developed the air snorkel device independently, and plaintiff admitted on cross examination that a March 28, 1979 Yamaha interoffice memorandum regarding Yamaha's development of an air box and snorkel device effectively described what plaintiff successfully put into practice. See Exhibit 16. Nevertheless, the memorandum itself demonstrates Yamaha had not fully resolved the stalling problems, and defendants produced no evidence of reports, drawings, tests or other

information showing any further independent development of the air snorkel device from April to November 1979, at which time continuing difficulties were confirmed by the November report of Yamaha all terrain vehicle project engineer Nobuaki Shiraishi. See Exhibit 19; Shiraishi deposition, p. 89. The next reports are dated September 1980 (Exhibits 20 and 21) and show no significant progress over a year after the air snorkel concept first appears in Yamaha documents. The earliest Yamaha patent application for the device in question was not until a June 22, 1981 application for a Japanese patent, see Exhibit 30, in the name of Yamaha employee Tanaka.

Yamaha representative Bob Aron testified that a number of dealerships relayed to Yamaha customer complaints regarding stalling, and many dealers tried various "contraptions" to resolve the problem. The Court does not find credible that Mr. Aron and other Yamaha representatives would not have reported an adjustment that worked, and defendants have made no showing they had developed a workable device by the time of the Yamaha representatives' visits to Cycle Country. The evidence before this Court leads to the inference that Yamaha had no effective resolution to the problem until after the visit to Cycle Country. Yamaha's failure to produce witnesses or records to negate this inference leads to the further inference that any evidence produced by Yamaha would be unfavorable to the defendants.[5]

Yet, the Court has no doubt Yamaha would have developed the air snorkel device independently in due course, given Yamaha's prior awareness and development of the concept behind the modified air intake system and the apparent simplicity

_____

and in bad faith in failing to respond to discovery requests.

**4.** Bob Aron testified he could not *recall* a visit he made to Cycle Country with two representatives of Yamaha Japan. The Court distinguishes such testimony from a denial the visit occurred and further notes defendants' utter lack of cooperation, as of the time of trial, in providing

documentation of Yamaha representatives' travel in the United States and in responding to discovery requests relevant to this issue.

**5.** *See Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939); *International Union v. NLRB,* 459 F.2d 1329 (D.C.Cir.1972).

of the device.[6] Thus, the Court finds no benefit inuring to Yamaha to the detriment or impoverishment of plaintiff, and the simplicity of the device suggests any arguable enrichment to Yamaha was independent of plaintiff's actions.

However, even assuming pro arguendo Yamaha used plaintiff's idea as placed into practice by plaintiff,[7] plaintiff's failure to maintain the secrecy of the device defeats both his proprietary interest in the device and any inference of unfair benefit to Yamaha. In addition to disclosures discussed above, plaintiff specifically failed to maintain the secrecy of his device vis-a-vis Yamaha. Notwithstanding evidence that the Yamaha representatives "intruded" into Cycle Country areas marked "Employees Only", plaintiff permitted display of the modified tri-moto at Cycle Country, and Yamaha representatives were invited into Cycle Country. In fact, defendants' contention Yamaha developed the device on its own is supported by plaintiff's attempts to emphasize that the secrecy of the device was maintained because the seat cover partially shielding the device from view was not removed when the Yamaha representatives observed the tri-moto.

■ Nevertheless, the Court finds defendants have acted both negligently and in bad faith in needlessly increasing the costs of this litigation and in failing to cooperate in the pretrial discovery permissible under the Federal Rules of Civil Procedure.

The initial tone for such contumacious conduct was set by Yamaha U.S.' failure to waive service of the demands made against Yamaha Japan, even though Yamaha Japan had full knowledge of the demands against it and the same trial counsel were retained by both Yamaha Japan and Yamaha U.S. Nevertheless, Yamaha Japan forced plaintiff to go through the charade of serving it under the Hague Convention, additionally delaying the resolution of this matter and forcing expenditure of needless amounts for service.[8]

Further misconduct includes, but is not limited to, defendants' failure to respond fully and candidly to three sets of interrogatories and requests for production propounded by the plaintiff.[9] Of significant practical impact was defendants' failure to disclose their application for the American Tanaka patent (Exhibit 30) on June 18, 1982 and the grant of the patent on January 29, 1985, events occurring simultaneously to plaintiff's patent applications commencing March 21, 1983. Defendants renewed the denial of their ownership of a patent through January 1986. The American patent was not acknowledged even generally by defense counsel until early 1986, when defendants responded by letter to plaintiff's repeated inquiries in this regard.

· Defendants argue sanctions are inappropriate because the discovery request denying the existence of the patent was directed to Yamaha U.S. prior to Yamaha Japan's filing answer and was correctly answered by Yamaha U.S., who denied it held a pat-

---

**6.** Given the simplicity of the device, the Court would question the patentability of the device. However, this issue is not before the Court.

**7.** The impression made by the modified tri-motos is illustrated by defendants' chosing the Cycle Country dealership to make a promotional film on tri-motos.

**8.** Yamaha Japan filed a motion to dismiss or to quash service, and forced plaintiff to serve defendant under the Hague Convention, ignoring the Court's plea that defendants consider accepting service to facilitate the progress of this trial, particularly if Yamaha Japan intended to continue to present a joint defense with previously served defendants, as demonstrated by its retainer of already participating trial counsel to file the motion to quash service.

**9.** In May, 1983, plaintiff propounded his first set of interrogatories and requests for production to defendants. On July 19, 1983, plaintiff was forced to file a motion to compel discovery responses, which was ultimately dismissed as moot upon receipt of preliminary responses to those requests.

On April 13, 1984, plaintiff was granted leave to file an additional set of interrogatories, as to which plaintiff was again forced to file a motion to compel responses. The motion was granted and sanctions of $250 awarded. A second set of requests for production was filed June 7, 1984.

Thereafter, a third set of discovery requests was propounded to defendants as permitted by the Court's discovery order of November 25, 1985, Doc. No. 96.

ent, because the patent was held by Yamaha Japan.[10] However, the testimony at trial clearly demonstrated the close relationship between Yamaha U.S. and Yamaha Japan; representatives of Yamaha Japan were aware of this litigation and the relevance of the Tanaka patent to this litigation; and representatives of Yamaha U.S. contacted Yamaha Japan to obtain information necessary to answer plaintiff's discovery requests. Nevertheless, it was not until plaintiff confronted defense counsel with evidence of the Tanaka patent, after obtaining the participation of Yamaha Japan and serving it with discovery requests, that defendants acknowledged the existence of the patent. By that time, plaintiff had already expended much effort to discover independently the existence of the patent, and because proceedings in the U.S. Patent and Trademark office regarding Yamaha's patent application were terminated long before plaintiff discovered the patent, plaintiff was unable to take any appropriate action before the PTO.

In addition to its refusal to disclose the patent, defendants continuously provided incomplete documentation regarding patent applications and patent wrappers. As alluded to above, they also denied having records of visits by Yamaha representatives to Louisiana, which testimony and assertions the Court finds not credible.

In sum, the overall conduct of the defendants, as disclosed at the hearing regarding sanctions and during status conferences held before this Court prior to trial, demonstrates actions having no reasonably foreseeable consequence but to cause needless expense and unnecessary delay in this litigation. Moreover, the conduct of the defendants taken as a whole displays aggressive defense tactics, overly technical interpretations of the Court's rules in an attempt to manipulate the outcome of the suit and an utter refusal to act with candor and good faith in bringing issues before the Court for proper resolution.

Plaintiff must himself bear some responsibility for a relatively minor delay of this suit and does not come into Court with entirely clean hands in his complaints of Yamaha's delay. Specifically, plaintiff's counsel did not correctly advise the Court when seeking an extension of time regarding submissions required by the Court that plaintiff's patent application was flatly rejected. The Court has taken this misrepresentation into consideration in deciding whether to assess any sanctions against defendants due to their misconduct in responding to discovery and in deciding the quantum of such sanctions, and the Court nonetheless finds defendants' conduct overwhelmingly warrants sanctions.

The nature of defendants' conduct does not permit exact specification of attorney time, expenses and costs needlessly incurred on plaintiff's behalf. However, upon review of plaintiff's submissions re-

---

**10.** Defendant's initial Request for Production of documents filed on March 31, 1983 requested the following:

1. Any and all documents in the possession of defendant evidencing *any and all* [emphasis added] patent rights in the Yamaha tri-motorcycle and the air snorkel device within and which is the subject matter of this lawsuit.
2. Any and all documents evidencing original design drawings of the tri-moto air snorkel device which is the subject matter of this lawsuit.

On July 18, 1983, defendant responded to request number 1 as follows:

RESPONSE TO REQUEST NO. 1;
    *Yamaha has not applied for,* [emphasis added] and has not been issued, a patent on the high air intake device on the Tri-Moto three wheel motorcycle.

On that same date, defendants responded to request number 2 as follows:

RESPONSE TO REQUEST NO. 2:
    The original design drawings for the Yamaha Tri-Moto motorcycle including design changes for the high air intake are the property of, and are located in the business records of, Yamaha Motor Company, Ltd., a Japanese corporation, located in Japan. Drawings of the high air intake have been requested from Yamaha Motor Company, Ltd. The drawings are expected to take ninety days to obtain.

Following plaintiff's filing of a Motion to Compel Supplemental Answers to the Request for Production of Documents, defendants answered request number 2 as follows, on May 8, 1984:

    *Supplemental Response to request No. 2:*
    See drawings attached as Exhibit "F", 1 through 10.

garding attorney's fees, including time records and statements, the deposition of plaintiff's counsel, and records of expenses, the Court finds a fair sanction in this case is $25,000.

This conclusion is based upon many factors. First, the Court took into consideration the estimate of plaintiff's counsel, Steven Lane, that approximately 305 hours of his time should be attributed to discovery unnecessarily undertaken as a result of defendants' conduct.[11] The Court's line by line review of plaintiff's counsel's contemporaneous time records and invoices suggests a conservative finding of at least 270 hours needlessly expended by Mr. Lane, in addition to time expended by the Keaty law firm for specialized assistance on patentability issues and patent applications, as documented by their invoices. An award of sanctions computed on the basis of 270 hours attorney's time is also deemed reasonable, because this amounts to only 37% of the total time spent on the case by Mr. Lane alone. See Lane Deposition p. 16. The Court also finds a reasonable value of $85.00 per hour should be placed upon Mr. Lane's time, which would provide for a total fee in the amount of $22,950.00, but the Court has increased the fee to $25,-000.00, based upon its consideration of other factors, including, but not limited to, the Court's recognition that a certain amount of expenses were needlessly incurred and that other attorneys were also put to needless work.

In reaching these conclusions, the Court reviewed the following exhibits, submitted as P-45 in globo: Documentation of attorney's fees incurred by Steven Lane for January 1984 through June 1984, including a cover summary and daily time sheets for attorney Lane; daily time sheets for July 1984; Herman, Herman, Katz and Cotlar statement for services rendered from August 1984 through July 1986; daily time sheets for attorney Lane from January 1985 through December 1985; and Herman, Herman, Katz and Cotlar statement for services rendered for August 1986.

Counsel for plaintiff marked the foregoing documents so as to indentify particular time entries for time allegedly needlessly spent. These records permit an item by item determination of Mr. Lane's allegations regarding his efforts, and the Court finds Mr. Lane's allegations supported by the evidence.

The Court further finds that the amount of time spent and as to which sanctions are being considered does not represent any duplication of effort and represented a considerable amount of legal work and investigation using a certain amount of special expertise. Moreover, the Court's experience and knowledge of the time required to prepare cases suggests that the time attributed by Mr. Lane to defendants' wrongful conduct is reasonably related to defendants' actions.

In addition, investigatory work searching for a possible patent entailed a particular amount of novelty and difficulty and required a certain amount of skill to perform the work properly. This is confirmed by the retainer of the Keaty firm to assist in handling proceedings before the Patent Office. Yamaha's actions also required research into the methods of service permissible under the Hague convention and necessitated cumbersome discovery through depositions of foreign residents.

The preclusion of other employment by the attorney due to the acceptance of this case does not suggest any particular finding applicable to this case, nor does the undesirability of the case or the nature and length of the professional relationship with the client. Nor does the Court find its proposed sanctions disproportionate to the results obtained, even though plaintiff has not prevailed. Plaintiff may well have achieved a result more satisfactory to him had he been able to intercede in proceedings before the patent office.

The Court finds that a $85.00 per hour fees is a reasonable basis for computing sanctions in light of the amount at which

---

**11.** Originally, Mr. Lane attributed 367.25 hours to defendants' improper conduct. During his deposition, however, Mr. Lane admitted that

amount should be reduced by a total of 62.35 hours, as stated on pp. 45, 54, 58, 60, 61, 72, 80, 102, 106–08 and 114 of Mr. Lane's deposition.

attorney's fees are billed by other lawyers similarly situated in the legal community in the Eastern District. The Herman law firm fee in this case was to be contigent, see Lane deposition, p. 11, but the Court's computation of sanctions is not materially affected by this factor, because the Court is awarding sanctions based upon particular items of legal work, as documented by Mr. Lane's time records, to the best the Court is able to attribute particular items of activity to the defendants' conduct. The Court is of the further opinion that a $85.00 per hour reasonably compensates Mr. Lane in comparison to other lawyers of his relative experience and reputation in the legal community.

### Conclusions of Law

This Court has subject matter jurisdiction over plaintiff's state law claims by virtue of the Court's diversity jurisdiction. Federal courts also have jurisdiction over patent disputes by virtue of 28 U.S.C.A. § 1338, but the Court need not reach the issue of its subject matter jurisdiction over plaintiff's request that the Court assign the Tanaka patent or declare it invalid [12], in light of the parties' stipulation that the Tanaka patent may be unenforceable depending upon the Court's findings as to the existence of a trade secret.[13]

Under Rule 41 of the Federal Rules of Civil Procedure, a defendant in a case tried without a jury may move for dismissal at the close of the plaintiff's evidence on the ground that, upon the facts and law, the plaintiff has shown no right to relief. In deciding whether to grant a motion for involuntary dismissal,

> The Court is not as limited in its evaluation of plaintiff's case as it would be on a motion for directed verdict. The Court is not to make any special inferences in the plaintiff's favor nor concern itself with whether the plaintiff has made out a prima facie case. Instead it is to weigh

the evidence, resolve any conflicts in it, and decide for itself where the preponderance lies.

9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2371, pp. 224–25. Thus, even assuming a plaintiff establishes a prima facie case on the merits, this does not preclude granting a motion for involuntary dismissal on grounds that plaintiff has shown no right to relief. *See Stearns v. Beckman Instruments, Inc.*, 737 F.2d 1565, 1568 (Fed.Cir.1984).

In determining whether plaintiff has made out a prima facie case and/or whether the evidence preponderates in the plaintiff's favor, this Court specifically considered the elements of plaintiff's claim for misappropriation of a trade secret under Louisiana law and for quantum meruit.

La.R.S. 51:1431(4) defines a "trade secret" as:

> information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> (a) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and
>
> (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*See also Lamb v. Quality Inspection Services, Inc.*, 398 So.2d 643, 645 (La.App. 3d Cir.1981); *Wheelabrator Corp. v. Fogle*, 317 F.Supp. 633, 636–37 (W.D.La.1970), *aff'd*, 438 F.2d 1226 (5th Cir.1971).

The statute entails three criteria: The method or device must have economic value; it must not be generally known and readily ascertainable by other persons; and reasonable efforts must have been maintained to preserve the device's secrecy. *Tubular Threading, Inc. v. Scandaliato*, 443 So.2d 712, 714 (La.App. 5th Cir.1983).

---

**12.** Plaintiff requests the patent be declared void in paragraph 10 of his Third Supplemental and Amending Complaint.

**13.** This stipulation is based upon the principle under federal statute that a patent for an inven-

tion may not be obtained where the invention was in public use in this country for more than a year prior to the date of the application for the patent. 35 U.S.C.A. § 102(b).

*See also Standard Brands, Inc. v. Zumpe,* 264 F.Supp. 254, 260–63 (E.D.La.1967); *Restatement of Torts* § 757, Comment (b) (1939).

Thus, in order to establish that a device was a protected trade secret, a plaintiff must prove by a preponderance of the evidence that:

1. Plaintiff took reasonable steps to protect and insure the "secrecy" of his device;

2. Plaintiff did not voluntarily reveal his "secret" to the general public or to employees, or to people in the industry, without requiring that they maintain secrecy; and

3. That his device was not generally known in the trade.

*See* LSA–RS 51:1431(2)(a), 51:1431(4)(a) and (b); *Wheelabrator Corp. v. Fogle, supra; Standard Brands, Inc. v. Zumpe, supra; Lamb v. Quality Inspection Services, Inc., supra.* The Court finds plaintiff Wilbert Sheets has not established that his device was a trade secret under these standards.

Plaintiff bears the burden of proving that the device he alleges to be a "trade secret" possesses "a substantial element of secrecy—so that except by use of improper means, there would be difficulty in acquiring the information." *Wheelabrator v. Fogle, supra,* 317 F.Supp. at 637. Plaintiff must take reasonable precautions to ensure the secrecy of his device. *E.I. DuPont de Nemours & Co. v. Christopher,* 431 F.2d 1012, 1015–16, *reh'g and reh'g en banc denied,* 431 F.2d 1017 (5th Cir.1970), *writ denied,* 400 U.S. 1024, 91 S.Ct. 581, 27 L.Ed.2d 637 (1971). Moreover, protection under trade secret laws depends upon a "continuing course of conduct" to maintain secrecy. *Electro-Craft Corp. v. Controlled Motion, Inc.,* 332 N.W.2d 890 (Minn.1983). Whereas patent protection and noncompetition contractual clauses depend on a single act to provide protection, "[t]rade secret protection depends upon a continuing course of conduct by the [inventor]...." *Id.* at 901.

Comment (f) following LSA–RS § 51:1431 notes, "[P]ublic disclosure of information through display, trade journal publications, advertising, or other carelessness can preclude protection," and that "The efforts required to maintain secrecy are those reasonable under the circumstances," citing *E.I. Dupont de Nemours v. Christopher, supra.*

The facts established at trial in this matter, as set forth in detail above, contradict plaintiff's claim that he maintained his device as a trade secret so as to warrant statutory protection. Accordingly, his demands under the Trade Secret Act must be dismissed.

The Court also examined plaintiff's demands for recovery under the doctrine of unjust enrichment, pretermitting the issue whether the Trade Secret Act pre-empts any other rights to relief under state law.

In order to maintain an action for unjust enrichment, a plaintiff must establish five prerequisites: (1) there must be an enrichment; (2) there must be an impoverishment; (3) there must be a connection between the enrichment and resulting impoverishment; (4) there must be an absence of "justification" or "cause" for the enrichment and impoverishment. *See Minyard v. Curtis Products, Inc.,* 251 La. 624, 205 So.2d 422, 432 (1967). In addition, the action will only be allowed where there is no other remedy at law, which requirement is based upon "the principle that the action must not be allowed to defeat the purpose of a rule of law directed to the matter at issue. It must not, in the language of some writers, 'perpetrate a fraud on the law.' " *Id.* at 433.

Reviewing these requirements, the Court concludes plaintiff has failed to make out a prima facie case that his invention inured to the direct benefit of Yamaha, as the evidence suggests Yamaha might have developed the invention itself in due course. Moreover, the Court is concerned that application of the quantum meruit doctrine in this case would contravene the more particularized requirements of Louisiana's Trade Secret Law and those of the Patent Statutes, which prevent the patentability of an item placed in the public domain. *See* 35 U.S.C.A. § 102(b).

On the issue of sanctions, this Court has discretion to fashion discovery sanctions permissible under Rule 11 and Rule 37 of the Federal Rules of Civil Procedure. The reason for the failure is an important consideration in determining what sanction to impose. *See* 8 Wright & Miller, *supra,* § 2284, p. 766. In this case, the defendants have presented no reasonable excuse for their failure to participate in discovery in good faith. On the contrary their contumacious conduct appears wholly willful, as discussed above. Thus, although the Court is bound to "make such orders in regard to the failure as are just" and should exercise its discretion in a fashion intended to encourage discovery rather than simply to punish for a failure to make discovery, the Court finds this is a case of flagrant failure to cooperate in discovery justifying appropriately serious sanctions. *See generally id.* § 2284. This failure to cooperate persisted through the trial and at a time when encouraging discovery in this particular case was moot, thus the Court also deems deterrence of such conduct in the future a permissible end. The Court anticipates the Yamaha defendants will have further litigation in the U.S. courts, and they should be taught at this juncture to participate in such litigation in good faith and within the rules provided by the federal courts. Accordingly, the Court deems a sanction in the amount of $25,000.00 reasonable and supported by the considerations enumerated by *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974). *See also Day v. Allstate Ins. Co.,* 788 F.2d 1110 (5th Cir.1986) (*Johnson* factors applied in assessing attorneys' fees as sanctions under Rule 37).

The Court's decision to assess sanctions is also supported by *United States Freight Co. v. Penn Central Transp. Co.,* 716 F.2d 954 (2d Cir.1983) (per curiam), wherein the second circuit stated, "General deterrence, rather than mere remediation of the particular parties' conduct, is a goal under Rule 37; unconditional impositions of sanctions are necessary to deter 'other parties to other lawsuits' from flouting 'other discovery orders of other district courts.' " *Id.* at 955 (citing cases).

For the foregoing reasons, the Court DISMISSES plaintiff's claims against the defendants with prejudice. However, plaintiff is entitled to sanctions against the defendants in the amount of $25,000, and the Clerk of Court is directed to enter judgment in plaintiff's favor accordingly, defendants to bear all costs.