Wilbert J. SHEETS, Plaintiff-Appellant, Cross-Appellee,

v.

YAMAHA MOTORS CORP., U.S.A., et al., Defendants-Appellees, Cross-Appellants.

No. 87-3420.

United States Court of Appeals, Fifth Circuit.

July 12, 1988.

Steven J. Lane, Russ M. Herman, New Orleans, La., for plaintiff-appellant, cross-appellee.

David F. Bienvenu, Donald Ensenat, New Orleans, La., for defendants-appellees, cross-appellants.

Before THORNBERRY, WILLIAMS and DAVIS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

Appellant, Wilbert J. Sheets, appeals the district court's dismissal of his lawsuit which asserted causes of action against appellees under the Louisiana Uniform Trade Secrets Act and the equitable doctrine of unjust enrichment. We affirm the dismissal. All parties appeal the $25,000 in sanctions the court awarded appellant. Appellant asserts he is entitled to heavier sanctions while appellees claim that no sanctions were proper. We remand the issue of sanctions back to the district court for further elaboration of the court's basis for awarding the sanctions.

I.

Wilbert J. Sheets is a 66 year old resident of Gonzales, Louisiana. He retired in 1973 from his job as a machinist at Exxon. His two sons, Wayne and Tommy, opened a motorcycle dealership in 1974 in Gonzales called Cycle Country U.S.A. Cycle Country became a Yamaha dealership in March 1976. Wayne and Tommy were the sole partners in the dealership; Wayne handled sales and Tommy handled maintenance and repairs. Wilbert worked with his sons at Cycle Country, helping with maintenance and acting as a mechanic and troubleshoot-

er. Wilbert, however, was not a salaried employee of Cycle Country and did not receive any compensation for the services he provided the dealership.

In December 1979, Cycle Country received an initial shipment of two model number 125 Yamaha tri-motorcycles. This was the first tri-motorcycle manufactured by Yamaha. Its intended purposes included recreational use in water, mud, dust, snow, and other elements. It was advertised as being an "all-terrain vehicle" suitable for hunting, fishing, farming, professional racing, "swampratting," and desert and mountain travel. Cycle Country sold one of these tri-motorcycles to a customer and used the other as a demonstrator.

In February 1980, Cycle Country received a shipment of 50 additional model 125's. Members of the Sheets family bought a number of these tri-motorcycles and raced them. Tommy, Wayne, and Wilbert all personally experienced problems with the engine stalling or drowning on the 125. Cycle Country received similar complaints from other customers to whom the dealership had sold 125's. Similar complaints were also being received by other Yamaha dealers in the area. Evidently the placement of the air intake system at the back of the machine between the two rear wheels allowed water, dust, and other foreign matter to be drawn into the carburetor, causing the vehicle to stall or drown out. The debris was also causing premature wearing of internal engine parts. Tommy and Wayne asked their father to see if he could fix this problem with the 125's engine.

In March 1980, Wilbert Sheets modified the engine of Cycle Country's demonstrator model by running an air hose from the air intake box between the rear wheels to the front of the tri-motorcycle under the seat. The hose acted as a snorkel for the air intake system, bringing in air from the front of the vehicle at a higher level than before. Wilbert plugged up the air intake pipe located within the air intake box. Wilbert also experimented with different sizes of fuel jets to find the size effective with the air box improvements in ensuring the proper air/fuel mixture. Overall, Wilbert Sheets claims these modifications effectively solved the stalling problems and enabled the tri-motorcycle to perform as advertised.

With the exception of the fuel jet modification, the entire device could be seen either by removing the seat of the tri-motorcycle, which did not require tools, or by turning the machine on its side. Customers of Cycle Country were permitted to drive the modified demonstrator model. Appellant also modified a number of the tri-motorcycles owned by friends and relatives who belonged to the Cycle Country tri-motorcycle racing team.[1] Neither Cycle Country nor appellant, however, sold a tri-motorcycle with the air snorkel device, nor did appellant ever sell an air snorkel device. Wilbert Sheets continued to fine tune his modification on the tri-motorcycles owned by family and friends over the next few months.

In mid-March 1980, Wayne Sheets showed and explained the air snorkel device to Bob Aaron, a Yamaha U.S.A. district sales manager, during Aaron's regular bimonthly visit to Cycle Country. Apparently Wayne Sheets did not show Aaron the entire modification but did tell him that his father had devised a modification to the engine which would solve the problems the machine was experiencing. Appellant claims Aaron returned two weeks later with two Yamaha representatives from Japan who examined and photographed the modified tri-motorcycle. Appellant claims he arrived at Cycle Country just as Aaron and the Yamaha representatives were leaving and remembers one of the representatives holding a camera. Aaron did not make out a dealer report documenting this second visit to Cycle Country, contrary to his usual habit. At trial he denied remem-

---

1. Appellant claims to have told these individuals not to make his invention known to others. He claims he felt these people would not divulge his invention because by doing so they would lose their competitive edge in racing. Neither Tommy nor Wayne nor Wilbert, however, placed any restrictions upon the resale of these modified tri-motorcycles. Some of the modified tri-motorcycles were in fact resold the following year.

bering this second visit and the names of the two Yamaha representatives. Tommy and Wayne Sheets had been present during this visit and their testimony supported their father's claims.

Two weeks later, appellant claims Aaron returned to Cycle Country with two more representatives from Yamaha. Only Wayne Sheets was present at the shop during this visit, and he did not recall if anyone had photographed or examined the modified tri-motorcycle during this visit. Again, no dealer report was made of this visit by Aaron.

Aaron visited the shop again in August 1980 and, according to Tommy Sheets, asked Tommy to bring a modified tri-motorcycle to a Yamaha service seminar in New Orleans later in the month. Tommy complied with this request. This seminar was limited to Yamaha employees and dealers. Wilbert Sheets' modification evidently was discussed at the seminar as a solution to the shifting and drowning problems the 125 was experiencing.

In April 1981, Tommy and Wayne Sheets sold their interests in Cycle Country, including the modified demonstrator, to a third party, and entered into a release with Yamaha U.S.A. Wilbert Sheets was not a party to this release.

In November 1981, Wilbert Sheets saw a Yamaha advertisement in Outdoor Life magazine, publicizing the company's new tri-motorcycle model number 175 which contained an air intake device very similar to his modification on the 125. Wilbert Sheets immediately sought legal advice and eventually filed suit in federal district court against Yamaha Motors Corp., U.S.A.[2] on October 5, 1982. His suit claimed damages for the alleged advantages and benefits realized by Yamaha as a result of Yamaha's alleged misappropriation of his invention and its incorporation by Yamaha into the model 175 tri-motorcycle. His claims were based in part upon the Louisiana Uni-

form Trade Secrets Act for misappropriation of a trade secret and upon unjust enrichment principles in Louisiana law.

On March 21, 1983, Wilbert Sheets applied for a United States patent on his air intake device. After abandonment of this patent application, Wilbert Sheets filed a second patent application on February 19, 1985. His patent counsel was notified on June 11, 1985, by the United States Patent and Trademark Office that most of his claims were unpatentable because of a previous patent issued on January 29, 1985, to Ko Tanaka of Shizuoka, Japan, and assigned to Yamaha Japan.

Trial on the merits of appellant's suit against Yamaha U.S.A. and Yamaha Japan was held before the district court without a jury on August 25 and 26 and December 29, 1986. Following the presentation of appellant's case, appellees moved for involuntary dismissal under Fed.R.Civ.P. 41(b). On April 3, 1987, the district court dismissed the entire case under Rule 41(b) after finding that Wilbert Sheets had failed adequately to maintain the secrecy of his invention and thus could not recover under the Trade Secrets Act or for unjust enrichment. The court, however, awarded Wilbert Sheets sanctions under Fed.R.Civ.P. 11 and 37 of $25,000 against Yamaha U.S.A. and Yamaha Japan for failure of the Yamaha firms to carry out pretrial discovery in good faith and for needlessly increasing the costs of the litigation. *Sheets v. Yamaha Motors Corp., U.S.A.,* 657 F.Supp. 319 (E.D.La.1987).

Appellant appeals the district court's finding that he failed to make reasonable efforts to maintain the secrecy of his invention as required under the Trade Secrets Act and the court's finding that he had no cause of action for unjust enrichment.

## II.

In this diversity jurisdiction lawsuit, we look to the law of the state of Louisiana to

---

**2.** On April 6, 1984, appellant amended his complaint to add as a defendant Yamaha Motor Company Ltd. ("Yamaha Japan"), a Japanese corporation and the actual manufacturer of the tri-motorcycles. Proper service was not made on Yamaha Japan until July 1985. Yamaha

Motors Corp., U.S.A. ("Yamaha U.S.A."), a California corporation, is a wholly owned subsidiary of Yamaha Japan and is the distributor of Yamaha motorized products for Yamaha Japan in the United States.

determine the substantive rights of the parties under both of appellant's claims. As to the trade secrets claim, Louisiana has adopted a version of the Uniform Trade Secrets Act, La.Rev.Stat.Ann. § 51:1431 *et seq.* Under this act, a "trade secret" is defined in § 51:1431(4) as:

information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (a) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Comment (f) under this provision provides:

Reasonable efforts to maintain secrecy have been held to include advising employees of the existence of a trade secret, limiting access to a trade secret on a "need to know basis," and controlling plant access. On the other hand, public disclosure of information through display, trade journal publications, advertising, or other carelessness can preclude protection.

Comment (f) shows that Louisiana has adopted the concept of "relative secrecy" as opposed to "absolute secrecy" in its trade secrets act. "The efforts required to maintain secrecy are those reasonable under the circumstances, and courts do not require extreme and unduly expensive procedures be taken to protect trade secrets." *Tubular Threading, Inc. v. Scandaliato,* 443 So.2d 712, 714 (La.Ct.App.1983). *See also E.I. duPont deNemours & Company v. Christopher,* 431 F.2d 1012 (5th Cir. 1970), *cert. denied,* 400 U.S. 1024, 91 S.Ct. 581, 27 L.Ed.2d 637 (1971) (explaining relative secrecy under Texas law); *Tri–Tron International v. Velto,* 525 F.2d 432 (9th Cir.1975) (explaining relative secrecy under California and Montana law); *K–2 Ski Company v. Head Ski Co., Inc.,* 506 F.2d 471 (9th Cir.1974) (Maryland and Washington law).

The district court found that Wilbert Sheets had failed to use reasonable efforts under the circumstances to maintain the secrecy of his modification to the Yamaha tri-motorcycle and thus was not entitled to recover damages for the alleged misappropriation of the modification under the Uniform Trade Secrets Act. The determination of whether relative secrecy exists in a particular case is a question of fact reviewable by this Court under the clearly erroneous standard of review. *Tri–Tron International,* 525 F.2d at 436; *K–2 Ski Company,* 506 F.2d at 474.

■ Upon our review of the record, we must conclude that the district court's finding that appellant failed to take reasonable efforts under the circumstance to maintain the secrecy of his invention is not clearly erroneous. As the district court noted, appellant allowed one of the modified tri-motorcycles to be shown at a Yamaha service seminar in August 1980. He also let Cycle Country, a company in which he had no proprietary interest, use a modified tri-motorcycle as a demonstrator, apparently without restriction. Further, he installed his modification on the tri-motorcycles of at least nine other individuals and gave them, at most, only minimal instructions not to reveal the modification to others. These limited attempts at secrecy appear to have had more to do with maintaining the Cycle Country racing team's competitive edge in racing and less to do with maintaining the secrecy of the modification itself.

■ Apparently, appellant also allowed several Yamaha representatives to enter Cycle Country and examine and photograph his modification without taking any efforts at maintaining the secrecy of the modification. There had been no need for appellees to resort to subterfuge or other improper means in order to obtain information pertaining to the modification. *Hurst v. Hughes Tool Company,* 634 F.2d 895, 898 (5th Cir.), *cert. denied,* 454 U.S. 829, 102 S.Ct. 123, 70 L.Ed.2d 105 (1981). *Cf. E.I. duPont deNemours & Company, supra; A.H. Emery Company v. Marcan Products Corporation,* 389 F.2d 11 (2nd Cir.), *cert. denied,* 393 U.S. 835, 89 S.Ct. 109, 21 L.Ed.2d 106 (1968). A disclosure of a trade secret to others who have no obli-

gation of confidentiality extinguishes the property right in the trade secret. *Ruckelshaus v. Monsanto Company*, 467 U.S. 986, 1002, 104 S.Ct. 2862, 2872, 81 L.Ed.2d 815 (1984). *See also Interox v. PPG Industries, Inc.*, 736 F.2d 194, 202 (5th Cir. 1984).

### III.

Wilbert Sheets also asserts a cause of action under general equitable principles of unjust enrichment, or an *actio de in rem verso*, under Louisiana law. Following French jurisprudence, the Louisiana Supreme Court has adopted five prerequisites to this type of action:

> (1) [T]here must be an enrichment, (2) there must be an impoverishment, (3) there must be a connection between the enrichment and resulting impoverishment, (4) there must be an absence of "justification" or "cause" for the enrichment and impoverishment, and finally (5) the action will only be allowed when there is no other remedy at law, i.e., the action is subsidiary or corrective in nature.

*Minyard v. Curtis Products, Inc.*, 251 La. 624, 205 So.2d 422, 432 (1967). *See also Diggs v. Hood*, 772 F.2d 190, 193 (5th Cir. 1985); *Austin v. North American Forest Products*, 656 F.2d 1076, 1088 (5th Cir. 1981).

The district court gave several reasons for holding that Wilbert Sheets did not have a cause of action under the doctrine of unjust enrichment. We address only one of these rationales, as we find it dispositive. The district court was concerned that the application of the unjust enrichment doctrine in this case would contravene the more particularized requirements of the Louisiana Uniform Trade Secrets Act. We share the district court's concern and hold that the fourth and fifth prerequisites to the application of this equitable doctrine were not met in this case.

■ Louisiana enacted an express statutory scheme to protect individuals and entities in the position of Wilbert Sheets when it adopted the Uniform Trade Secrets Act. Under Louisiana law, Wilbert Sheets is not entitled to fall back on the equitable doctrine of unjust enrichment after failing to establish a trade secret due to his failure to make reasonable efforts to maintain secrecy. Thus, in a very real sense the enrichment by Yamaha was brought about by Wilbert Sheets' own failure to maintain the secrecy of his invention.

■ Louisiana law makes clear that when an adequate remedy at law is available, the court may not resort to principles of equity. *Austin v. North American Forest*, 656 F.2d at 1089. *See* La.Civ.Code Ann. art. 21; *Minyard*, 205 So.2d at 433. An action for unjust enrichment must not be allowed to defeat the purpose of a rule of law directed to the matter at issue. *Edmonston v. A–Second Mortgage Co. of Slidell, Inc.*, 289 So.2d 116, 122 (La.1974). In *Austin v. North American Forest*, we held that a court applying Louisiana law could not resort to equity even though the remedy at law was barred by prescription. Wilbert Sheets had a remedy under the Trade Secrets Act by which he could have recovered for the alleged misappropriation of his modification to the Yamaha tri-motorcycle. He failed to gain the protection of this act by his carelessness. Under Louisiana law he cannot now invoke principles of equity to recover for the benefits he alleges appellees enjoyed at his expense.[3]

### IV.

After ordering additional briefing on the issue of sanctions and reconvening trial to hear evidence on this subject, the district court awarded Wilbert Sheets $25,000 in sanctions from appellees. The court found that appellees had "acted both negligently

---

3. Passing reference should also be made to La. Rev.Stat.Ann. § 51:1437 which sets out the preemptive effect of the Louisiana Uniform Trade Secrets Act on other law. It should be emphasized, however, that we are not deciding this case on this express preemptive effect of the Uniform Trade Secrets Act but instead upon the prerequisites to the application of the doctrine of unjust enrichment under Louisiana law. As a result, we perceive no need to certify the question of preemption by § 51:1437 to the Louisiana Supreme Court as requested by appellant.

and in bad faith in needlessly increasing the costs of this litigation and in failing to cooperate in the pretrial discovery permissible under the Federal Rules of Civil Procedure." 657 F.Supp. at 323. Behavior cited by the court as supporting these sanctions included: Yamaha U.S.A.'s failure to waive service of process on behalf of Yamaha Japan and forcing Wilbert Sheets to serve Yamaha Japan under the Hague Convention; appellees' lack of cooperation in providing documentation of Yamaha representatives' travel in the United States and in responding to discovery requests relevant to this issue; and appellees' failure to respond fully and candidly to three sets of interrogatories and requests for production of records from appellant.

We have some doubt as to the propriety of the breadth of the court's award of sanctions in this case. Our doubts arise primarily from the court's rather vague references both to the rules under which it was basing its sanctions and the behavior the court was actually sanctioning.

The court made general references to Rule 37 in its opinion regarding the award of sanctions. The court, however, did not specify which section of Rule 37, if any, it was actually invoking to award the sanctions. Specificity is important because sanctions under Rule 37(b)(2) require that the party against whom the sanctions are levied failed to "obey an order to provide or permit discovery." The court made no reference to any particular order that appellees failed to obey. We do not search the record for an order that might possibly support the district court's $25,000 award

under Rule 37(b)(2) because this may not be the portion of the record upon which the court relied. *See Fjelstad v. American Honda Motor Co., Inc.,* 762 F.2d 1334, 1338–9 (9th Cir.1985). Sections (c) and (d) of Rule 37, the only other sections seemingly of some relevance, do not require that the sanctioned party fail to obey a discovery order.

The district court's primary objection to appellees' behavior, besides the court's belief that appellees generally were not cooperating in discovery and were needlessly increasing the cost of the lawsuit, was that Yamaha U.S.A. had answered falsely (in the court's opinion) as to its knowledge of patent rights its parent company had obtained in an air snorkel device.[4] Because of Yamaha U.S.A.'s misleading responses as to Yamaha Japan's patent rights, Wilbert Sheets' attorneys claim that they ran up well over $25,000 in attorney's fees and expenses in discovering the patent themselves and in attempting to secure a patent on behalf of Wilbert Sheets. Sheets' attorneys claim these fees and expenses would not have been expended had appellees informed them that Yamaha Japan did have a patent application pending before the U.S. Patent and Trademark Office as early as 1981. There was extensive briefing and testimony on these expenses and the district court's award of $25,000 in sanctions appears to be based largely on this claim.[5]

Rule 26(g) would appear to be the rule most applicable to the overall award of sanctions in this case. The district court, however, mentioned Rule 26(g) only in passing in its opinion and relied instead on

**4.** Appellees defend their actions by noting that the discovery requests regarding the existence of the patent were directed to Yamaha U.S.A. prior to Yamaha Japan's being made a party to the lawsuit and filing its answer. Appellees assert that Yamaha U.S.A.'s denial of the existence of any patent rights was a proper response since the patent was held by Yamaha Japan, the separate parent company of Yamaha U.S.A., and Yamaha U.S.A. had no knowledge of the patent rights held by its parent company.

**5.** We have serious doubts as to whether some of the district court's other reasons for awarding the sanctions are proper. There appears to be no basis for sanctioning appellees for forcing

appellant to execute service of process on Yamaha Japan under the Hague Convention. Yamaha Japan clearly had the right to be served under the proper service procedure. The two corporations appear to have had legitimate business reasons for insisting on this right, including avoidance of judicial piercing of the corporate veil and imposition of liability on one corporation for the acts of the other. There was also no discussion of the expenses incurred by appellant's counsel due to appellees' lack of cooperation in providing documentation of appellees' representatives' travel in the United States and in responding to discovery requests relevant to this issue.

Rule 37 and Rule 11. We acknowledge that Rule 26(g) closely parallels Rule 11 and note that the two rules appear to overlap. Rule 26(g), however, applies exclusively to discovery requests, responses, and objections while Rule 11 has been interpreted by some commentators to apply only to those papers, pleadings, and motions for which other sanction provisions are not applicable. *Thomas v. Capital Security Services, Inc.*, 836 F.2d 866, 870–71 (5th Cir. 1988) (en banc); *Zaldivar v. City of Los Angeles*, 780 F.2d 823, 829–30 (9th Cir. 1986); *National Association of Radiation Survivors v. Turnage*, 115 F.R.D. 543, 555 (N.D.Cal.1987). *See also* Notes of Advisory Committee on Rules accompanying Rule 11 ("Although the encompassing reference to 'other papers' in the new Rule 11 literally includes discovery papers, the certification requirement in that context is governed by proposed new Rule 26(g). Discovery motions, however, fall within the ambit of Rule 11.")

In summary, we conclude that a remand to the district court is needed in order for that court to make additional findings so as to state more specifically the bases upon which it awarded Wilbert Sheets $25,000 in sanctions against appellees. As the district court's holding now stands, it is unclear what specific behavior the court was sanctioning and what rules, or provisions within these rules, the court relied upon to award sanctions. Until the district court makes such specific findings and conclusions, we are unable to exercise effectively our appellate review of the court's action.

AFFIRMED IN PART, REMANDED IN PART.