584 So.2d 373 (1991)
Clyde McPHEARSON
v.
SHELL OIL COMPANY, Shell Offshore, Inc., Bill Davis and Shoney La Sauge.
No. 90-CA-2131.
Court of Appeal of Louisiana, Fourth Circuit.
July 31, 1991.
*374 David F. Bienvenu, Carrie A. Jourdan, Hoffman, Sutterfield, Ensenat & Bankston, New Orleans, and Ronald E. Corkern, Jr., Watson, Murchison, Crews, Arthur & Corkern, Natchitoches, for plaintiff/appellee.
William L. Brockman, New Orleans, for defendants/appellants.
Before SCHOTT, C.J., and KLEES and BECKER, JJ.
SCHOTT, Chief Judge.
Defendant, Shell Offshore, Inc., has appealed from a judgment in favor of plaintiff on the basis of unjust enrichment for his design and installation on defendant's offshore rig of an auger system. The case was tried to a jury on written interrogatories. The central issue is whether plaintiff's recovery is precluded by the Louisiana Uniform Trade Secrets Act, LSA-R.S. 51:1431 et seq.
In the spring of 1984 plaintiff was employed as a welder by Nordrill, Inc. aboard the Nordrill OILER which was engaged by defendant to drill for oil in the Gulf of Mexico. It became necessary to use oilbased drilling mud on the job with the result that special procedures for disposal of the cuttings became necessary. These cuttings were the soil or other material displaced at the bottom of the hole as the drill progressed downward and forced up to the surface on the outside of the drill pipe. When water-based drilling mud was used the cuttings could be dumped into the Gulf, but when oil-based drilling mud was used environmental considerations required that the cuttings be collected in tanks near the drill and the full tanks taken to shore for disposal.
When plaintiff was first on the job the cuttings were to be transported from the drill to the tank in a trough arranged to provide for the cuttings to move by gravity with the assistance of workers who paddled or shoveled the cuttings along.
Exactly how the construction and installation of the auger system came about is a matter of great conflict among the witnesses. However, for our purposes on appeal, we consider these conflicts to have been resolved by the jury in plaintiff's favor, and we accept as facts the version and details provided by plaintiff in his testimony. Before summarizing this testimony, identification of the various players in this drama is helpful to an understanding of the story.
Louis Chevalier was plaintiff's foreman and Michael Sepulvado was a crane operator. They were both employees of Nordrill on the OILER. Harley La Sauge was Shell's representative aboard the OILER and his supervisor was Bill Davis whose office was in New Orleans.
Plaintiff noted that the trough method of moving the cuttings from the drill pipe to *375 the tank presented problems. As it depended primarily upon the force of gravity to move the material, the trough would frequently become clogged and required workers to stand by with shovels or paddles to keep the material moving. Since the trough was open on top much of the wet, oily material spilled onto the deck of the rig. Plaintiff thought he could construct an auger system consisting of an enclosed pipe containing a screw whose threads would force the material through the pipe.
Plaintiff was instructed by Chevalier, to build another trough and discussed his idea of the auger system with Sepulvado the day before starting the trough. As he was taking measurements in preparation for the trough he was called to Chevalier's office where he met with Chevalier, La Sauge, and Sepulvado. Asked by La Sauge if he could improve on the trough system plaintiff told him about his auger system proposal. La Sauge told him if he (plaintiff) thought it would work he (La Sauge) would see if he could get its construction approved. Plaintiff took measurements, computed the size of the components he needed, and gave the "shopping list" of parts to La Sauge who said he would order them. When the parts were delivered, plaintiff constructed the system. Sepulvado and some men under his supervision assisted in the construction. The system was activated and worked well to the satisfaction of everyone on the rig.
After plaintiff had given the foregoing description of how the auger system had come about the following testimony was elicited:
Q. Did you discuss building any other augers or auger systems in the future with anyone on the rig?
A. At one point, I was up above where the auger was. And Mr. Sepulvado walked up close to me, and I told him thatwe were assisting there watching it work. And I told him, I said, "Boy, that thing is sitting there just making money." And I said, "Here I am on the ground floor. Maybe I can get something going with it. Maybe I can start a little business where I can rent these or lease them to Shell. They have already got one out here and it's working. They know that it works. So that wouldn't be a problem. And so maybe I can talk to them and maybe rent or lease these or maybe sell them to him. But I was on the ground floor and I figured it's time to try to do something like that.
When his "hitch", this particular tour of duty on the rig, was over, plaintiff called Bill Davis in New Orleans. Davis knew about the auger system and stated that "everybody was really enthused about it and liked it." Plaintiff told him:
"What I want to talk to you about is renting them, building these things, renting them, leasing them to Shell, maybe making a little money on the side and saving Shell a little money, too. And he said, "I'm very interested in what you have to say. Can you be here Friday morning?" I said, "I'll be there with bells on."
A few days later plaintiff met with Davis at his office, and he told him he wanted to build more augers and lease or sell them to Shell. Davis asked him how much he would charge and plaintiff said $250 per day based upon the saving in labor required by the trough method. Davis stated he thought this was fair, they shook hands on it, and Davis stated that he would authorize the purchase of the materials and component parts.
As plaintiff was not scheduled to return to the rig for the next two weeks he spent this time locating the material and parts he would need for the construction of additional systems. However, when he reported to the rig for his next hitch he was fired by Chevalier who said he was following La Sauge's instructions. The auger system on the OILER continued to be used and similar systems were installed on two other rigs.
Plaintiff acknowledged that at the time he was fired by La Sauge the auger system had been inspected and photographed and was within the common knowledge of the members of the offshore drilling community. Plaintiff had made no effort to keep it *376 a secret and he had not tried to obtain a patent.
Plaintiff's case was based on the equitable theory of unjust enrichment. In order to recover he had the burden of proving that 1) defendant was enriched; 2) he was impoverished; 3) there was a connection between the enrichment and the impoverishment; 4) there was no justification or cause for the enrichment and impoverishment; and 5) plaintiff had no remedy at law. Minyard v. Curtis Products, Inc., 251 La. 624, 205 So.2d 422 (1967).
In response to written interrogatories the jury found that plaintiff proved the first four elements enumerated above. Since the fifth element presents an issue of law, the trial judge did not present it to the jury, but decided it himself, in favor of plaintiff.
Defendant's principal contention on appeal is that the trial court erred by failing to apply the Louisiana Uniform Trade Secrets Act (UTSA), LSA-R.S. 51:1431 et seq., to the facts of the case and to recognize that this act precludes recovery by plaintiff on the theory of unjust enrichment.
The UTSA defines a trade secret as a device, method, technique, or process which 1) derives economic value by virtue of its not being generally known or readily ascertainable by proper means by others who could obtain economic value from its use, and 2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. § 1431(4). Misappropriation of a trade secret entitles the owner to injunctive relief, as well as damages. §§ 1432 and 1433. The UTSA displaces conflicting laws pertaining to civil liability for misappropriation of a trade secret. § 1437.
The trial court erred in finding that plaintiff established the fourth and fifth elements of the doctrine of unjust encroachment, to wit, no legal justification for the enrichment and impoverishment and no legal remedy available to plaintiff. The UTSA is designed to protect one's invention from misappropriation by others provided the inventor protects the secrecy of his invention from public knowledge and use in the first instance. Conversely, the inventor who does not avail himself of the protection afforded by the UTSA cannot be heard to complain if the invention is appropriated by a member of the public. In the present case plaintiff assembled the auger system voluntarily at the request and with the assistance of defendant's La Sauge with no thought of protecting the system from copying by others including defendant. Only after the system was built and functioning did he conceive the idea of leasing or selling it to defendant. By this time not only was it being used without restriction by and with the full knowledge of defendant and other personnel aboard the OILER but it had been inspected and even photographed by others who came aboard the OILER from other places. Consequently, when plaintiff met with Davis, his invention, if it can be designated as such, was already in the public domain, available to anyone to copy it. Thus, the auger system was no longer plaintiff's to lease or sell to defendant or anyone else. Defendant was free to use it. The legal cause or justification of defendant's enrichment by copying the system and plaintiff's impoverishment by failing to profit by his invention was his own failure to protect it from entering the public domain by availing himself of the benefits of the UTSA.
A plaintiff may resort to the equitable theory of unjust enrichment for recovery of a loss only if there is no legal remedy available to him. In the present case plaintiff had a legal remedy which he waived. Having done so, he cannot rescue himself from his predicament by resorting to the doctrine of unjust enrichment which has no application to a situation where there was a legal remedy.
In reaching these conclusions we subscribe to the reasoning of the court in Sheets v. Yamaha Motors Corp., U.S.A., 849 F.2d 179,184 (5th Cir.1988) whose facts are practically identical to those in the present case. Indeed, the facts of the Sheets case foster greater sympathy for *377 the plaintiff than in the present case, but the conclusions are unassailable.
The foregoing discussion is dispositive of the case, but further comment is necessary to avoid the implication that had plaintiff complied with the UTSA in the first instance his invention would have been eligible even for the act's protection. Uncontradicted evidence in the record established that plaintiff's auger system was not novel but had been used extensively, at least as a component of a grain combine. As grain is harvested by a combine it often contains an auger system to carry the grain into the combine's storage container. Plaintiff simply took an old idea and gave it a new application. In no sense can it be said that he invented the system itself. We need not decide whether one can obtain a patent or protection under the UTSA for such an application but the question looms in this case.
Accordingly, the judgment appealed from is reversed and set aside and there is judgment in favor of defendant, Shell Offshore, Inc., and against plaintiff, Clyde McPhearson, dismissing his suit at his cost.
REVERSED.