IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 28, 2009

Charles R. Fulbruge III
Clerk

No. 08-20220

ERIK ADAM IBARRA; ET AL

Plaintiffs

v.

MARY BAKER; FRANK E SANDERS

Defendants - Appellants

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

SEAN CARLOS IBARRA

Plaintiff - Appellee

v.

HARRIS COUNTY TEXAS; ET AL

Defendants

MARY BAKER; FRANK E SANDERS

Appellants

08-20220
08-20276

———————

Consolidated with
No. 08-20276

———————

ERIK ADAM IBARRA

                                        Plaintiff

v.

HARRIS COUNTY TEXAS; ET AL

                                        Defendants

v.

MR SCOTT A DURFEE

                                        Respondent - Appellant
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
SEAN CARLOS IBARRA

                                        Plaintiff

v.

HARRIS COUNTY TEXAS; ET AL

                                        Defendants

v.

SCOTT A DURFEE

                                        Appellant

———————

Appeals from the United States District Court
for the Southern District of Texas

---

Before JOLLY, PRADO, and SOUTHWICK, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:[*]

These two appeals are from findings of attorney misconduct.

Mary Baker, Scott Durfee, and Frank Sanders represented Harris County, Texas, and several of its law enforcement officers in a 42 U.S.C. § 1983 action. The district court found that Baker and Sanders improperly coached defense witnesses, gave or abided false testimony, and vexatiously released a plaintiff's medical records. During the same § 1983 litigation, but in a completely separate incident, Durfee's client deleted approximately 2,500 emails that were under subpoena. The district court found Durfee partially to blame for the emails' deletion. It held Durfee in contempt and sanctioned him for attorney misconduct. It imposed monetary sanctions against all three attorneys, and it disqualified Baker and Sanders from further representation in the case.

The underlying § 1983 litigation has settled, and the attorneys' monetary sanctions have been paid or considered paid. Baker, Sanders, and Durfee nevertheless appeal from the findings of attorney misconduct, asserting that the findings are erroneous and will mar each attorney's professional reputation.

The attorneys' concern about their reputation suffices to confer Article III jurisdiction. Durfee's appeal is meritorious, and we vacate all findings that he committed misconduct. We also vacate the findings that Baker and Sanders gave or abided false testimony, but we affirm the findings that Baker and Sanders improperly coached witnesses.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

I.

We begin by addressing our jurisdiction over these appeals. Though the attorneys' monetary sanctions have been paid or considered paid, their appeals are not moot. See Fleming & Assocs. v. Newby & Tittle, 529 F.3d 631, 640 (5th Cir. 2008) ("Any non-monetary portion of the sanctions not rendered moot by settlement is appealable for its residual reputational effects on the attorney."); Dailey v. Vought Aircraft Co., 141 F.3d 224, 226 (5th Cir. 1998) ("This appeal is not moot because the [temporary] disbarment on the attorney's record may affect her status as a member of the bar and have other collateral consequences."); Walker v. City of Mesquite, 129 F.3d 831, 832-33 (5th Cir. 1997) ("[T]he importance of an attorney's professional reputation, and the imperative to defend it when necessary, obviates the need for a finding of monetary liability or other punishment as a requisite for the appeal of a court order finding professional misconduct."). We will proceed to consider the appeals' merit.

II.

We apply the same standard of review to both appeals. We review the legal standard under which the district court sanctioned the attorneys de novo, and we review the district court's factual findings of attorney misconduct only for clear error. "The clear error standard of review 'precludes reversal of a district court's findings unless [the court] is left with a definite and firm conviction that a mistake has been committed.'" Houston Indep. School Dist. v. V.P. ex rel. Juan P., 566 F.3d 459, 465-66 (5th Cir. 2009) (quoting Jauch v. Nautical Servs., Inc., 470 F.3d 207, 213 (5th Cir. 2006)).

The remainder of this opinion proceeds as follows. We will first set out the facts common to both appeals.[1] We will next consider Baker's and Sanders's

---

[1] Our scope of review affects how we will recount the history of these appeals. As a court of review, we do not search the record for information that "might possibly support" the district

appeal, setting out the facts relevant only to that appeal and then assessing the validity of the findings that Baker and Sanders committed attorney misconduct. Finally, we will consider Durfee's appeal, setting out the facts relevant only to that appeal and then assessing the validity of the findings that Durfee committed attorney misconduct.

III.

Both appeals arise from the same underlying litigation, which originated as follows.

Sean Ibarra and Erik Ibarra resided at 2907 Shady Park Drive, Houston, Texas. In January 2002, Harris County law enforcement officers executed a search and arrest warrant at the residence next door, 2911 Shady Park Drive. At least one plain-clothed officer was present at the scene.[2] While the officers were executing the search warrant, Sean Ibarra stepped outside his residence and, standing from 2907 Shady Park Drive, began photographing 2911 Shady Park Drive.

Deputy Preston Foose noticed Sean taking photographs. Foose asked Sean to cease, and he also asked Sean to give him the camera. Sean refused and, according to Foose, fled toward his residence. Foose followed, and Deputy Dan Shattuck also gave chase.

Foose and Shattuck caught up to Sean at his residence. An altercation ensued. Madalyn Valdez, who also resided at 2907 Shady Park Drive, joined in

court's imposition of sanctions. Sheets v. Yamaha Motors Corp., 849 F.2d 179, 185 (5th Cir. 1988). Instead, we confine our attention to that portion of the record upon which the district court relied. Id. We will thus highlight only those portions of the record that the district court either mentioned or obviously relied upon in finding that Baker, Sanders, and Durfee committed attorney misconduct.

[2] The litigants have referred to one or more officers being "undercover." The record reveals that "[t]he undercover officers were wearing jackets with the word 'POLICE' on the jacket that identified them as police officers." We will refer to these officers as plain-clothed.

the altercation. Erik Ibarra also participated briefly, then left and retrieved a video recorder. He began to record the altercation when he returned.

More officers arrived, and they gained control of the situation. The officers seized Sean's camera and Erik's video recorder. They arrested Erik for resisting arrest, Sean for evading arrest and resisting arrest, and Valdez for resisting arrest and assault. The district attorney's office prosecuted all three.

Sean and Erik were acquitted. They then filed separate civil actions against various Harris County defendants.[3] The Ibarras alleged, inter alia, that the defendants had violated their constitutional rights by arresting them and seizing their belongings.

IV.

Mindful of these facts, we turn to consider Baker's and Sanders's appeal.

A.

Harris County Attorneys Mary Baker and Franks Sanders initially undertook the defendants' representation. Sanders represented Foose; Baker represented Shattuck and several other defendants. The attorneys hired Albert Rodriguez, a commander with the Texas Department of Public Safety, to consult on the defense and to testify as an expert witness. The findings of attorney misconduct arise from their interaction with Rodriguez, and with defense witnesses whom he was advising.

1.

In January 2004, Rodriguez interviewed Foose, Shattuck, and two other officers who had been present at Shady Park Drive on the date of the Ibarras' arrests. Baker attended this interview, and Sanders may have been in and out.

---

[3] The Ibarras named the following defendants: Harris County, Texas; Harris County Sheriff's Department; Harris County Organized Crime Task Force; Sheriff Tommy Thomas; Foose; Shattuck; Deputy Sheriff Manuel Moreno; Sergeant Alexander Rocha; and Deputy John Palermo. The Ibarras' actions, though filed separately, were later consolidated.

Partially on the basis of this interview, Rodriguez prepared a preliminary expert's report describing 2911 Shady Park Drive as being in a "high crime area" and opining that:

> Deputy Foose, as any well trained law enforcement officer, believed that . . . Sean Ibarra was photographing the undercover officers for the purposes of retaliation. Deputy Foose also believed that Sean Ibarra photographing the undercover officers presented a danger to the undercover officers. Deputy Foose believed that reasonable suspicion existed to legally stop and detain Sean Ibarra . . . .
>
> Sean Ibarra's flight confirmed that reasonable suspicion existed to legally stop and detain Sean Ibarra. In my opinion any reasonable and prudent law enforcement officer could have believed that attempting to stop and detain Sean Ibarra was legal, justified, and necessary when presented with the same or similar circumstances.

The terms "high crime area" and "retaliation" would become linchpins of the officers' § 1983 defense. They also would become the focus of the sanctions against Baker and Sanders.

Soon after Rodriguez filed his preliminary report, the Ibarras deposed a series of witnesses: Rodriguez on August 27, 2004; Foose on September 10; Sergeant Alexander Rocha, another defendant who had been present at the scene, on September 13; and Shattuck on September 15. Rodriguez met with each officer, alone, the day or two before the officer's deposition. Rodriguez flew from Austin to Houston to meet with Foose on September 9. He spoke over the phone with Rocha on September 12. He flew from Austin to Houston to meet with Shattuck on September 13.

These one-on-one meetings came to light during the officers' depositions, where the Ibarras voiced concern that Rodriguez had used the meetings to adulterate the officers' testimony. The Ibarras inquired whether Baker or

Sanders had approved the meetings. The answer was yes; Baker (and, in the case of Foose, Sanders) had authorized Rodriguez to contact the officers. The Ibarras' counsel further inquired what had transpired during Rodriguez's face-to-face meetings with Foose and Shattuck.

Foose responded that he and Rodriguez had met over lunch. Rodriguez had given him Rodriguez's copy of the Valdez/Ibarra criminal-trial transcript, which Foose flipped through during the meeting. Rodriguez had highlighted portions of the transcript and written notes in the margins during his own review of it; Foose testified that he saw this markup. He also testified, however, that he and Rodriguez had not discussed the transcript's substance during their meeting.

On further inquiry, Foose recounted that he and Rodriguez had discussed the Ibarra litigation—but only in very general terms. He also testified that, during the meeting, Rodriguez had asked him whether Foose knew the definition of reasonable suspicion; Foose testified that he answered by giving a very general definition of that term. The pair possibly had a similarly abstract colloquy about probable cause. Foose denied that he and Rodriguez had gone into detail about how reasonable suspicion or probable cause applied to Sean's seizure or arrest. He also denied that Rodriguez advised him how to testify at the deposition other than to tell the truth.

Events that occurred the next day suggest otherwise. Foose attended his deposition as scheduled, and he brought a page of notes with him to the deposition. These notes outline a key concept for the defense, articulable facts supporting reasonable suspicion to detain Sean. The notes begin with a general definition for reasonable suspicion, and they list eight specific facts giving rise to Foose's reasonable suspicion to detain Sean. The notes also contain a general definition for "Elements of Evade Detention," a Texas crime cited in Rodriguez's preliminary report. Rodriguez's preliminary report lists the same eight facts

supporting reasonable suspicion to detain Sean, in roughly the same order as Foose's notes. Foose testified that he had made the notes by himself after meeting with Rodriguez.

One of the facts listed in Foose's notes was that the events of January 4, 2002, had occurred in a "high crime area." This note was the first time in the § 1983 proceedings or any of the prior criminal proceedings that a defendant referred to 2911 Shady Park Drive as being in a "high crime area." The Ibarras questioned Foose about the address being in a high crime area. He elaborated that he had learned 2911 Shady Park Drive was in a high crime area during a briefing before the officers executed the January 4, 2002, warrant at that address. This testimony was the first time that Foose had mentioned the briefing. The Ibarras pressed for details about the briefing—where it occurred, who gave it, who else was present—but Foose was unable to provide even a single detail.

Further damaging to his testimony, Foose often vacillated and claimed inability to recall important details of his meeting with Rodriguez that, again, had occurred the day prior. The district court later would find that Foose had a "predisposition to recollect facts that support the defense's theory of defense while denying recollection of other key or contradictory evidence."

The Ibarras' counsel later asked Shattuck what had transpired during Shattuck's one-on-one meeting with Rodriguez. Shattuck responded that he had met with Rodriguez over breakfast. Rodriguez asked Shattuck to tell him again what had occurred on January 4, 2002; and whether his recollection had changed since the pair had last spoken on January 15, 2004. Shattuck testified that he and Rodriguez had not talked about Shattuck's upcoming deposition.

After learning the above facts, the Ibarras moved for sanctions. They asserted that Rodriguez had drawn the concepts of "high crime area" and

"retaliation" out of thin air to help the defendants avoid § 1983 liability. They also asserted that Rodriguez had persuaded the officers to alter their testimony to support these engineered defense theories. Furthermore, they asserted, Baker and Sanders had condoned or encouraged this behavior—and had attempted to cover it up.

2.

The district court scheduled a sanctions hearing for November 29, 2004. Before the hearing occurred, Baker voluntarily withdrew from the case. At the November 29 sanctions hearing, the court received testimony from Rodriguez, Foose, Shattuck, and others concerning sanctions; and the court scheduled a second hearing for January 2005 to receive testimony from Baker and Sanders.

During the interim, the Ibarras discovered billing records indicating that Rodriguez had flown from Austin to Houston to meet with Baker and Sanders on September 8, 2004—the day before Rodriguez had flown to Houston to meet with Foose. Rodriguez had never mentioned the September 8 meeting. Baker and Sanders also had not mentioned the meeting; the discovered billing records were the first the Ibarras had heard of it.

At the second sanctions hearing, Baker acknowledged that she and Sanders had met with Rodriguez on September 8, 2004. Baker testified that the meeting primarily had involved another case. She testified that Rodriguez and the attorneys may have discussed the Ibarra litigation briefly, but Rodriguez's billing of the meeting to the Ibarra litigation was erroneous.

Baker also testified that Sanders had authorized Rodriguez to meet with Foose and had authorized Rodriguez to give Foose his copy of the criminal-trial transcript. Baker testified that she had authorized Rodriguez to contact Rocha and Shattuck. The purpose of Rodriguez's meetings with Foose and Shattuck, Baker testified, was for Rodriguez to determine where the officers and Sean had

been standing when Sean was taking photographs of 2911 Shady Park Drive. Rodriguez's purpose for contacting Rocha, so far as Baker understood, was to determine whether Rocha's recollection had changed in any way that might affect Rodriguez's supplemental report. Furthermore, Baker testified, Rodriguez "has a very calming effect on officers who are going to testify. And the depositions were very stressful." Though Rodriguez was the defense's expert on reasonable suspicion and probable cause, Baker testified that she did not intend, or want, Rodriguez to discuss those subjects with the officers. She instead expected Rodriguez to collect facts from the officers and to calm them by explaining broadly how testifying in a civil action differs from testifying in the officers' more familiar setting of a criminal action.

Finally, Baker addressed the fact that she had attended the November 2004 sanctions hearing. (She had sat in the gallery, having already withdrawn from the case.) The Ibarras' counsel identified several apparent inconsistencies in the witnesses' testimony at that hearing and questioned Baker whether she had known that the witnesses were giving false testimony. Baker responded that she had believed some of the testimony to be mistaken but did not know whether any testimony was false.

When Sanders testified, he spoke mostly to other issues. He did, however, answer some questions about apparent inconsistencies in witnesses' testimony during the November 2004 hearing. Sanders explained that he had not believed any inconsistencies to be material. On cross-examination, he further testified to having no evidence that a defendant, witness, or attorney had committed a crime of making a false declaration, perjury, conspiracy, tampering, or subornation of perjury during the proceedings.

The Ibarras' counsel also questioned Sanders about several aspects of Foose's deposition. Early in the deposition, Foose had testified that he had met

with Rodriguez the day before, had received Rodriguez's copy of the Valdez/Sean trial transcript, and had spoken generally about the case. Sanders soon thereafter called for a break and left the room with Foose. Foose's testimony for the rest of the deposition was that he and Rodriguez had met the day before but had not discussed the Ibarra litigation in detail. The Ibarras' counsel inquired why Sanders had called for the break, which had occurred only seventeen minutes into the deposition.[4]

3.

The district court considered the sanctions motions against Baker and Sanders together with sanctions motions against Rodriguez and the defendants. The court concluded that "Rodriguez, the officers and their attorneys, Sanders and Baker, gave false testimony and/or abided the giving of false testimony during the November 29, 2004, hearing before the Court." It elaborated that Baker and Sanders:

> knew or should have known of the significant inconsistencies between the officers' criminal trial testimonies, their incident reports and their deposition testimonies. Moreover, they knew that Rodriguez's testimony contradicted that of the officers, in material respects. Yet, they condoned and/or encouraged false testimony by Rodriguez.

Rodriguez's false testimony, the court found, concerned his purpose for meeting with Foose, Rocha, and Shattuck on the eve of their depositions. Though Rodriguez had testified that he met with Foose and Shattuck to determine where the officers and Sean had been standing immediately before Foose approached

---

[4] Sanders testified that, before the break, he and the Ibarras' counsel had a spat about whether Rodriguez's deposition occurred August 27 or later; and that he took the break to locate a copy of the Rodriguez deposition's transcript to verify its date. The Ibarras challenged this explanation, correctly pointing out that Sanders acknowledged before calling for the break that Rodriguez's deposition indeed had occurred on August 27.

Sean, the court found that Rodriguez's true purpose in holding the meetings had been to "coach" the witnesses to ensure that their deposition testimony "would conform to facts that supported his opinion." The attorneys' September 8 meeting with Rodriguez demonstrated their involvement in this scheme.

Finally, the court found, Baker and Sanders intentionally had released one of the plaintiff's medical records "to humiliate, embarrass[,] and aggravate the plaintiffs." The district court sanctioned Baker and Sanders for attorney misconduct. It also found Rodriguez's and several witnesses' conduct sanctionable. It disqualified Baker and Sanders, and it imposed monetary sanctions of $10,000 against Baker, Sanders, and Harris County.

Baker and Sanders sought reversal of their sanctions through petition for a writ of mandamus. We denied the petition. The underlying § 1983 litigation later settled. Under the settlement agreement, the monetary sanctions against Baker and Sanders are considered paid. The attorneys timely appealed, seeking to reverse the findings that they committed attorney misconduct. They assert that the findings mar their professional reputation.

B.

We now turn our attention to the findings that Baker and Sanders committed attorney misconduct. These findings fall into two categories: that Baker and Sanders improperly coached witnesses and that Baker and Sanders "gave false testimony and/or abided the giving of false testimony during the November 29, 2004, hearing before the Court."

1.

An attorney enjoys extensive leeway in preparing a witness to testify truthfully, but the attorney crosses a line when she influences the witness to alter testimony in a false or misleading way. See generally John S. Applegate, Witness Preparation, 68 Tex. L. Rev. 277 (1989). The district court sanctioned

Baker and Sanders in part for using Rodriguez to alter the officers' deposition testimony substantively.

The evidence that Baker and Sanders engaged in this behavior is a bit scant, but the attorneys' appeal does not definitely and firmly convince us that the district court's findings are mistaken. To recap the evidence supporting sanctions, Rodriguez flew from Austin to Houston to meet with Baker and Sanders on September 8, 2004. They discussed the Ibarra litigation at least briefly. Rodriguez did not disclose that this meeting occurred when he testified at the November 29 sanctions hearing, and the meeting came to light only when the Ibarras discovered an entry for it in Rodriguez's billing records.

Rodriguez again flew from Austin to Houston on September 9. He met with Foose, alone. He arrived with a highlighted, marked-up copy of the Valdez/Ibarra trial transcript. Foose happened not to have a copy (other defendants did), and Rodriguez asked Baker and Sanders for permission to give Foose his own. The attorneys assented.

Foose arrived at his September 10 deposition with a page of notes that he claimed to have compiled, alone, after meeting with Rodriguez the day prior. Foose admitted discussing reasonable suspicion, in the abstract, with Rodriguez; but he denied discussing how that standard might apply to the Ibarra litigation. Foose's page of notes lists eight articulable facts supporting reasonable suspicion that Foose had for detaining Sean. These facts closely track Rodriguez's preliminary report.

Although Foose's meeting with Rodriguez had occurred only the day prior, Foose expressed fogginess about many of the meeting's details. The district court, which later had the advantage of observing Foose's demeanor as well as his testimony, ultimately found Foose not to be a credible witness.

14

Rodriguez flew again from Austin to Houston on September 13. He met with Shattuck, alone. Rodriguez testified that he flew to Houston to meet Foose and Shattuck partly so that he could visit 2911 Shady Park Drive to observe whether Sean could have been photographing anything other than undercover police officers. Rodriguez and Foose drove by the address but remained in Foose's patrol car; neither one stepped out of the car to stand where Sean had been standing. Rodriguez did not go even that far with Shattuck; they ate breakfast, and Rodriguez flew back to Austin without visiting Shady Park Drive.

Meanwhile, Rodriguez's preliminary report had introduced two new concepts that were becoming entrenched in the litigation as defense theories: Foose had reasonable suspicion to detain Sean out of a fear of "retaliation," and Foose and Shattuck had reasonable suspicion to detain Sean after his flight to 2907 Shady Park Drive because the flight occurred in a "high crime area." The Ibarras assert that these "terms of art" are additive of prior testimony, reflecting a conspiracy between Rodriguez, Baker, and Sanders to manufacture a record favorable to the defense. The appearance of these terms in the litigation would not be noteworthy if they merely repackaged the witnesses' prior testimony, neither adding nor subtracting anything substantive.

a.

"Retaliation" has multiple meanings. Its colloquial meaning is "the act of retaliating," "returning evil for evil." Webster's Third New International Dictionary of the English Language, Unabridged 1938 (1993). It also refers to a specific crime in Texas. See TEX. PENAL CODE ANN. § 36.06(a)(1)(A) (Vernon 2003) ("A person commits an offense if he intentionally or knowingly harms or threatens to harm another by an unlawful act in retaliation for or on account of the service or status of another as a public servant . . . .").

Before meeting with Rodriguez, Foose had testified only to a fear of "retaliation" in the colloquial sense: that photographs of plain-clothed officers someday might be published and endanger their safety. The Ibarras assert, and the relevant sanctions assume, that Rodriguez, Baker, and Sanders were using "retaliation" in reference to the Texas crime: Foose initially stopped and detained Sean with reasonable suspicion that Sean was committing the crime of retaliation. As the Ibarras correctly note, no testimony supported such a theory when Rodriguez filed the preliminary report.

The relevant question, in other words, is whether Baker and Sanders, through Rodriguez, used "retaliation" merely to restate Foose's concern for "officer safety" or instead to inject a new defense theory into the case, unsupported by testimony, that Foose stopped and detained Sean with reasonable suspicion that Sean was committing a crime.

Sanders evinced the latter intent on December 10, 2004, when he wrote in a motion opposing sanctions that:

> In his expert report and in his deposition testimony, Albert Rodriguez pointed out the facts known to Foose at the time he pursued and arrested Sean Ibarra supported a reasonable suspicion by Foose that Ibarra was committing or would commit the crime of Obstruction or Retaliation under § 36.06, TEX. PENAL CODE.

He attempted to retreat from this position during the January 2005 sanctions hearing, expressly disavowing the theory that Foose initially approached Sean with reasonable suspicion that Sean was committing the retaliation crime. Sanders instead maintained that would be pursuing a defense theory that Foose initially approached Sean with a concern that Sean someday would commit "retaliation," in the colloquial sense, against the plain-clothed officers.

Despite Sanders's January 2005 testimony, the weight of the evidence leaves us with something short of a "definite and firm conviction" that the district court erred in concluding that Baker and Sanders, acting through Rodriguez, improperly influenced Foose to testify in conformity with a novel defense theory, previously unsupported by fact, but which was advanced in Rodriguez's preliminary report. We affirm the findings of misconduct against Baker and Sanders for improperly coaching witness testimony concerning "retaliation."

b.

We also affirm the findings of misconduct against Baker and Sanders based on Foose's use of the term "high crime area" during his deposition. Rodriguez flew from Austin to Houston to meet with the attorneys on September 8. He billed the time to the Ibarra litigation, and the attorneys approved the billing. Rodriguez again flew from Austin to Houston on September 9, this time to meet with Foose, alone. He called Baker for permission to give Foose his copy of the Valdez/Ibarra criminal-trial transcript. Baker relayed Sanders's authorization, and Rodriguez handed Foose his copy of the transcript. Rodriguez had highlighted and made notes on portions of the transcript. Foose reviewed the transcript. Foose brought a page of notes with him to his deposition the next day. These notes closely tracked Rodriguez's report and referred to 2911 Shady Park Drive as being in a "high crime" area. During the deposition, Foose testified that he had not visited 2911 Shady Park Drive before traveling there January 4, 2002, to execute the warrant at that address. He testified that he learned 2911 Shady Park Drive was in a "high crime area" during a briefing. He could not, however, recall even a single detail about that briefing other than it occurred. He had never previously referred to 2911 Shady Park Drive as a "high crime area."

In the light of these facts, as well as others previously mentioned, we cannot say the district court clearly erred in finding that Baker and Sanders, through Rodriguez, improperly coached Foose's "high crime area" testimony. We affirm the findings of misconduct against Baker and Sanders for improperly coaching witness testimony concerning 2911 Shady Park Drive being in a "high crime area."

2.

The district court found that Baker and Sanders "gave false testimony and/or abided the giving of false testimony during the November 29, 2004, hearing before the Court."

Insofar as the district court found that Baker and Sanders gave false testimony during the November 29, 2004, hearing, the finding is clearly erroneous. Baker and Sanders did not testify until January 2005.

We next consider whether Baker and Sanders abided the giving of false testimony during the November 29, 2004, hearing. The rules of professional conduct permit an attorney to offer or use evidence that the attorney believes, but does not know, to be false. See ABA MODEL R. PROF'L CONDUCT 3.3; TEX. DISC. R. PROF'L CONDUCT 3.03, cmt. 15. The district court wrote that Baker and Sanders "knew or should have known" of inconsistencies in the police officers' testimony and "were aware of or should have been aware of Rodriguez's false testimony" during the November 29 hearing. Because the district court applied a legal standard too permissive of sanctions, we reverse. We vacate the relevant findings of misconduct.

In sum, we affirm the findings of misconduct against Baker and Sanders for improperly coaching witness testimony. We vacate the findings of misconduct against Baker and Sanders for giving or abiding false testimony during the November 29, 2004, hearing before the district court.

18

V.

We now turn to Durfee's appeal. The events relevant to this appeal occurred some three years after the Baker/Sanders episode.

A.

Durfee represented Harris County's District Attorney, Charles Rosenthal, in relation to subpoenas issued during the Ibarra litigation. On October 31, 2007, the Ibarras served a subpoena duces tecum on Rosenthal for all emails sent or received by Rosenthal, Rosenthal's First Assistant, or Durfee between July 1, 2007, and October 15, 2007. The subpoena encompassed 12,785 emails, 4,792 of which were in Rosenthal's email folders.

Durfee met with Rosenthal on November 5 and prepared to file a motion to quash the October 31 subpoena. Durfee accessed Rosenthal's computer, compiled a table listing the subject line of each of Rosenthal's subpoenaed emails, and printed the table. Durfee did not print the emails themselves, and he did not otherwise back them up. Durfee also did not specifically instruct Rosenthal to preserve the subpoenaed emails. Rosenthal, however, had received notice of the subpoena and later testified that he understood its scope.

After Durfee left Rosenthal's office on November 5, Rosenthal deleted approximately 2,500 of the subpoenaed emails. There is no evidence that Durfee knew Rosenthal was going to do this.

On November 20, the district court held a hearing to consider a motion for contempt that the Ibarras had filed concerning a different subpoena. Of relevance to the October 31 subpoena, the parties agreed at the November 20 hearing that, from November 26 through November 28, the plaintiffs would review all of the emails that were within the October 31 subpoena's scope. The parties further agreed that the Ibarras would depose Rosenthal when they completed reviewing the subpoenaed emails.

Also of relevance to the October 31 subpoena, Durfee still did not know that Rosenthal had deleted approximately 2,500 of the subpoenaed emails.

Durfee first learned of the emails' deletion near the close of business November 21, which was the day before Thanksgiving. He instructed the office's Director of Information Services Technology (Gary Zallar, or "Zallar") to work through the holiday weekend to recover as many emails as possible. Durfee did not immediately inform plaintiffs' counsel or the court that the emails had been deleted. Zallar worked through the weekend, but he was unable to restore all of the deleted emails.

On Monday, November 26, the records review began as scheduled. Durfee was unable to join plaintiffs' counsel for the records review, but at his direction a staff attorney informed them that Rosenthal had deleted some of the emails. Plaintiffs' counsel reviewed the remaining emails over the next three days and deposed Rosenthal the day after that. The plaintiffs moved for contempt and sanctions against Rosenthal on November 30, and they supplemented this motion on December 2 to include Durfee (and Rosenthal's First Assistant, who is not party to this appeal). The November 30 motion for contempt and sanctions was the first that the district court had heard of the deleted emails.

The district court considered the sanctions motion at a two-day hearing, soon after which the underlying § 1983 case settled. After the case settled, the district court: denied sanctions as to Rosenthal's First Assistant; held Rosenthal in contempt and sanctioned him $18,900; and held Durfee in contempt and jointly and severally liable for $5,000 of the $18,900. Rosenthal paid the monetary sanctions.

The district court supported its ruling against Durfee with the following reasoning. Durfee, "as Chief of the General Litigation Division . . . is fully responsible for, and charged with, managing the records of the District

20

Attorney's Office in all litigation involving the office . . . . In this role, he is responsible to his client(s) and the courts with respect to documents that are the subject of a subpoena." Durfee "'omitted' to act or advise his client" to preserve the subpoenaed emails. His failures to act included neglecting to: "implement[] a systematic procedure for the production or retention of documents responsive to the October 31 subpoena"; and "ensur[e] that certain relevant backup tapes were preserved." His failures to advise included neglecting to: "(1) give adequate instructions about what discovery was sought by the October 31 subpoena; (2) communicate with Rosenthal concerning the scope of documents reasonably available and responsive to the October 31 subpoena; and (3) communicate with Rosenthal concerning methods for storing the electronic data or other documents requested."

Additionally, the district court faulted Durfee: (1) for waiting until November 26 to inform plaintiffs' counsel that the subpoenaed emails had been deleted; (2) for not informing the district court that the subpoenaed emails had been deleted; and (3) for "making baseless representations about the completeness of the respondents' production in light of the fact that many of the documents called for by the subpoena had not been adequately searched for, had been deleted and/or were no longer available." The district court held that Durfee's failure immediately to disclose the deletions violated Rules 3.03(a); 4.01(b); and 8.04(a)(1), (3), and (4) of the Texas Disciplinary Rules of Professional Conduct. "[E]ven in the absence of bad faith," the district court held, Durfee's omissions merited sanctions "pursuant to the Court's inherent power." The district court also listed Federal Rules of Civil Procedure 26(g) and 45 as bases for the sanctions.

B.

The findings of misconduct against Durfee cannot stand unless the district court had a legal basis for finding Durfee's conduct sanctionable. The district court pointed to the following legal bases for sanctions: its inherent power; Federal Rules of Civil Procedure 26(g) and 45; and Texas Disciplinary Rules of Professional Conduct 3.03(a), 4.01(b), 8.04(a)(1), 8.04(a)(3), and 8.04(a)(4). We consider the validity of each legal basis in turn.

1.

"The court must make a specific finding of bad faith" to impose sanctions under its inherent power. Toon v. Wackenhut Corrections Corp., 250 F.3d 950, 952 (5th Cir. 2001). The district court here did not make a specific finding that Durfee acted in bad faith. It instead wrote that "even in the absence of bad faith," Durfee's omissions merited sanctions under the court's inherent power. Because the district court did not find that Durfee acted in bad faith, imposing sanctions against Durfee was an abuse of discretion insofar as the sanctions were based on the court's inherent power.

2.

The district court cited Federal Rule of Civil Procedure 26(g) as a basis for sanctioning Durfee. Rule 26(g) requires an attorney to certify that each discovery disclosure, "to the best of the person's knowledge, information, and belief formed after a reasonable inquiry," is "complete and correct as of the time it is made." FED. R. CIV. P. 26(g)(1). "If a certification violates this rule without substantial justification, the court, on motion or on its own, must impose an appropriate sanction on the signer, the party on whose behalf the signer was acting, or both." FED. R. CIV. P. 26(g)(3). When invoking Rule 26(g) as a basis for sanctions, the district court must specify which discovery certification was sanctionable. Cf. Sheets v. Yamaha Motors Corp., 849 F.2d 179, 185 (5th Cir. 1988) ("We do not search the record for an order that might possibly support the

22

district court's $25,000 award under Rule 37(b)(2) because this may not be the portion of the record upon which the court relied.").

Here, the district court did not point to a Rule 26 certification that Durfee made in relation to the October 31 subpoena as being sanctionable. Moreover, the record suggests that Durfee made no such certification: on November 26, Durfee, through a Harris County staff attorney, informed the Ibarras' counsel that the set of subpoenaed emails available for their review was incomplete because Rosenthal had deleted some. The district court also made no finding that any certification of completeness that Durfee did make was without substantial justification. Imposing sanctions against Durfee was an abuse of discretion insofar as the sanctions were based on Rule 26(g).

3.

The district court cited Federal Rule of Civil Procedure 45 as a basis for sanctioning Durfee. Rule 45 provides that the "issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena." FED. R. CIV. P. 45(e) (2008). Whether a person disobeyed a subpoena depends on what the subpoena required. See Fremont Energy Corp. v. Seattle Post Intelligencer, 688 F.2d 1285, 1287 (9th Cir. 1982) ("The subpoena served on Moss directed him to appear and testify at a deposition. This Moss did. The subpoena did not direct Moss to answer any of the specific questions propounded by Fremont. If he is to be held in contempt for failure to answer questions, then, it must be pursuant to Rule 37(b)(1) . . . .").

Here, no subpoena was issued to Durfee in his individual capacity. The October 31 subpoena commands "you" (presumably the person to whom the subpoena was issued) to produce emails. The subpoena does not command any other person to do anything. Durfee could not have disobeyed the subpoena if it

did not require him to act, and the district court therefore abused its discretion insofar as it sanctioned Durfee under Rule 45.

4.

The district held that Durfee violated Texas Disciplinary Rules of Professional Conduct 3.03(a) and 4.01(b) when Durfee failed immediately to disclose that Rosenthal had deleted the subpoenaed emails.

Texas Disciplinary Rule 3.03(a) provides that a lawyer shall not knowingly "fail to disclose a fact to a tribunal when disclosure is necessary to avoid assisting a . . . fraudulent act."  Texas Disciplinary Rule 4.01(b) similarly provides that, in the course of representing a client, a lawyer shall not knowingly "fail to disclose a material fact to a third person when disclosure is necessary to avoid . . . knowingly assisting a fraudulent act perpetrated by a client."

Durfee argues that his failure immediately to disclose the emails' deletion did not amount to assisting—much less knowingly assisting—a fraudulent act. We agree. Durfee learned of the emails' deletions near the close of business the day before Thanksgiving. He informed plaintiffs' counsel of the deletions the next business day, and he had a staff member work through the interim holiday weekend to recover the deleted emails. Though he did not immediately inform the court of the deletions, this failure did not amount to assisting a fraudulent act when Durfee already had informed the Ibarras' counsel of the deletions and had worked to recover the emails. The district court erred in using Texas Disciplinary Rules 3.03 and 4.01 as bases for sanctions.

5.

The district court held that Durfee violated Texas Disciplinary Rule of Professional Conduct 8.04(a)(1), (3), and (4) "[b]y failing to bring Rosenthal's actions to light upon becoming aware of them."  Texas Disciplinary Rule of Professional Conduct 8.04(a) states that a lawyer shall not:

24

(1) violate these rules, knowingly assist or induce another to do so, or do so through the acts of another, whether or not such violation occurred in the course of a client-lawyer relationship;

\* \* \*

(3) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(4) engage in conduct constituting obstruction of justice; . . . .

Durfee did not violate Rule 8.04(a)(1) for the same reasons that he did not violate Rule 3.03 or Rule 4.01. Rule 8.04(a)(3) also provides no ground to sanction Durfee because the district court did not find that, by failing to bring Rosenthal's actions to light, he engaged "in conduct involving dishonesty, fraud, deceit or misrepresentation"; the court instead described Durfee's conduct variously as neglectful or reckless.

In sum, the district court cited no valid legal basis for sanctioning Durfee. We vacate all findings that he committed attorney misconduct.

VI.

For the foregoing reasons, we render judgment that the district court's findings of attorney misconduct are AFFIRMED in part and VACATED in part. We AFFIRM the findings that Baker and Sanders improperly coached witnesses. We VACATE the findings that Baker and Sanders gave or abided false testimony during the November 2004 sanctions hearing. We VACATE all findings that Durfee committed attorney misconduct.

AFFIRMED in part and VACATED in part; judgment RENDERED.